Mel Marin                    **April 1, 2022**
Box 601133
San Diego, CA 92160

Plaintiff
*Pro Se*

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR = 1 2022

JEFFREY P. COLWELL
CLERK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| MEL MARIN, | ) | Civil  22-cv-64-GPG |
| | ) | |
| Plaintiff, | ) | FIRST AMENDED COMPLAINT |
| | ) | FOR FRAUD, AND |
| v. | ) | FOR CONVERSION |
| | ) | AND |
| LARRY DALE ROSS, JR. | ) | FOR VIOLATION OF THE |
| AND | ) | CALIFORNIA CIVIL CODE |
| ROADRUNNER SCOOTERS LLC, | ) | SECTION 1798.140(o)(1) |
| 2745 California Street | ) | AND |
| Denver, CO 80205 | ) | FOR INVASION OF PRIVACY |
| | ) | UNDER THE COMMON LAW |
| | ) | |
| Defendants. | ) | JURY DEMANDED |

1. This court has jurisdiction under 28 U.S.C. §1332 because the claim exceeds $100,000, and plaintiff is not domiciled in Colorado but defendants are.

2. Defendant ROADRUNNER is registered as a company in Colorado with the registration number 20191910125 to the above address, and ROSS is the alter ego and owner and/or controller of the entire company and directed the actions of ROADRUNNER as described herein.

1

## FIRST CAUSE OF ACTION FOR FRAUD

3. On January 2, 2022, at 10:20pm, after several exchanges of information request by plaintiff over several days to be certain of the representations of the defendants that they posted on the internet, plaintiff accepted the advertised offer to buy an electric scooter in the amount of about $1,500 by tendering the money with a bank card as require by the unilateral offer.

4. The terms of the contract included buyer providing a house address to which the scooter would be delivered, the buyer making payment for the full amount by card, and the seller making delivery from its Los Angeles warehouse to leave the next day, Monday, January 3, which was represented to arrive in San Diego by Tuesday morning, January 4.

5. The contract was established in California the instant the plaintiff submitted the bank transfer from California, thereby accepting the offer. Plaintiff received a confirmation of acceptance. At that point the scooter belonged to plaintiff. It did not belong to defendants any more. It was not theirs to keep.

6. However, instead of receiving the scooter, plaintiff received a notice from a third-party not identified in the contract suggesting the possibility that they had received plaintiff's confidential banking record and card information and name and address and name of the scooter from the defendants.

7. The third-party identified itself as "NOFRAUD" from an address in New

2

York City with no verification of its standing to conduct business there or anywhere else, requiring from plaintiff additional information showing his date of birth and other information to match with his account numbers for the card and bank account, to be sent through the internet as a condition to getting delivery of this same scooter. But the scooter never arrived. In other words, plaintiff's scooter was a hostage kept for purposes of extortion to suck private information from plaintiff.

8. These defendants never gave notice that a third-party would intervene and demand private identity records and financial account numbers as a condition to taking possession of the scooter.

9. Plaintiff did an investigation and determined that the third-party company does not exist, and the State of New York denied it was lawfully doing business in New York anywhere. Internet statements also suggested NOFRAUD was collecting private records to sell to buyers for identify theft.

10. To protect plaintiff from that party reaching into his account to steal funds, plaintiff closed that account, but his banker reported that they already grabbed the $1,500.

11. Plaintiff sent a message to defendants asking if that is an entity they work through and they confirmed it was. However, when plaintiff called and spoke with NOFRAUD staff at the number they provided to ask if plaintiff can do

3

something else instead of sending plaintiff's private records through the internet to prove whatever it is they are supposed to be proving in order to get his scooter without helping them collect his identity, like mailing plaintiff's ID directly to these defendants, they refused.

12.   Plaintiff then contacted these defendants again, to ask that they call his banker or accept from the banker a letter verifying the card and funds were available, and DALE refused.  Plaintiff the reminded them that his other private information could only be used for identity theft because all they need to know to confirm good payment is if the card is good and verified by his bank. They refused.  That means these defendants were in on the identify theft scheme to collect unnecessary records to sell to criminal identity brokers to later steal.

13.   Plaintiff then sent a notice of breach and notice of investigation for fraud by these defendants to them, and he informed them that the scooter he paid for was his, and they had no right to hold it hostage after plaintiff offered a reasonable verification to match validity from his own banker.

14.   He also informed them that he needed that scooter immediately to reach law libraries to conduct legal research within days or he would lose cases in which he was involved from inadequate access to a law library and that those cases exceeded $2 million in value and that plaintiff would ask these defendants to pay for that loss if they continue to hold the scooter.

4

15. In retaliation for that notice, defendants determined to never deliver the scooter. So they held plaintiff's scooter to punish plaintiff for demanding performance of the contract.

16. As a result, they retained plaintiff's means of doing the work he needed for these legal actions, and the kept the money plaintiff used to pay for the scooter so he could not "cover" and avoid serious financial loss by buying another comparable scooter because they held plaintiff's money he needed for a scooter.

17. Specifically, plaintiff was trying to complete a class in a college that was necessary for him to obtain a patent agent license from the United States, and that was necessary for him to apply for a graduate science school to collect a MS science degree necessary to market that patent license. He had already been asked to apply to firms that paid $150,000 to their patent agents once he received that license and was admitted to a school and on his way to a graduate science degree.

18. But that college refused to grant plaintiff additional reading time to complete tests because plaintiff had a reading disability created by a car accident, although plaintiff's request was supported by medical reports of physicians. Plaintiff had been forced to file a complaint with the Civil Rights Office of the Department of Education to compel the college to grant the reading accommodation so he could complete the course in time to apply for the agent license by summer 2022 and to apply for and gain entry to a specific ranked

5

graduate program starting in fall 2022.  He had no chance to take the college tests without the extra time.

19.  But the civil rights office gave plaintiff a deadline to submit his full legal argument to support his initial complaint so that gave him only days to receive the scooter in San Diego, and use it to reach the only open law library in the city, do the research on the law, draft the legal memo and submit it by end of day Wednesday, January 5.  He did not have the scooter in time.  He waited all Tuesday and it did not come.   He needed it to save time just reaching the law library because he could not walk through town due to back and leg injuries from the same car accident.

20.  When the scooter did not arrive, on Wednesday he tried to call a taxi and discovered there are few left because they went out of business because of Uber and he had to have a reservation a week in advance.  He could not use Uber because he used his money for the scooter and had no credit and they do not take money.   He tried the city bus and it took 4 hours to arrive and by the time it got to the law library he had only two hours because the library hours were shortened due to the COVID.   But because he reads very slowly he hours longer to do the legal research work and drafting.   He would have been able to do the research if he had the scooter one day earlier, by Tuesday as they represented.

6

21. Because he did not submit a full legal argument with supporting cases by Wednesday, on Thursday his request to the civil rights office was denied and he could not do the class, and he did not apply to the graduate program that needed that prerequisite class.  His next chance for application for entry to the school was Fall 2023.   That means he lost a full year of time to complete the class and, therefore, he lost a full year of salary he would have been paid after entry into the graduate program, or $150,000 of lost pay.   That means it also delayed the career.

22.  Moreover, because *this* action must take at least another full year before it reaches trial, he will now lose another $150,000 in opportunity cost for that salary he will have to wait two years to receive.

23.  His science GPA was 3.8 at the time and he was an honors graduate of a prior program and, therefore, his chance of being admitted to his graduate school and completing and gaining the work he was offered was high and was not speculative, under the rule in Haim v. Islamic Republic of Iran, 425 F.Supp. 2d 56, 71 (IV) n. 2 (D.C.D.C. 2006)(damages for loss of future earnings for future career were not speculative based on evidence that she was on Dean's list and showed exceptional academic performance) and Warren v. Greenfield, 595 A.2d 1308, 1314 (Pa. Super. 1991)(the fact that  plaintiff's business was "new and untried" does not prevent the plaintiff's losses from being foreseeable) and Bowers v. NCAA, 475 F.3d 524 (3d Cir. 2007) (student athlete may state claim for loss of

entire career by denial of athletic participation even though he never took  classes because he was wrongfully stopped early).

24.  Moreover, because the denial of plaintiff's scooter hurt plaintiff in California, that was the place of injury and that law is to be applied and under that law the denial or delay of starting a career without ever being paid any salary yet is a proper measure of damages according to Colvig v. RKO General, Inc. , 232 Cal.App.2d 56, 42 California Rptr. 473 (1965)(a sufficient allegation of damages is made for a jury by claiming a loss of $250,000 for being stopped from a career as a radio announcer), and Greenberg v. Hollywood Turf Club, 7 Cal.App.3d 968, 86 Cal.Rptr. 885, 890-91 [11](1970)(the plaintiff stated a claim for interference with trade or calling although he had no contract with anyone and no existing employment relationship).

25. Further, plaintiff's losses were foreseeable because he plainly told the defendants about that possible loss as he describes above, when they still had the power to avoid the harm by delivering the scooter at once, according to Vogue v. National Rolling Mills, 72 D. & C. 2d 332 (Chester Co. Pa. 1974)(defendant knew plaintiff had left work in another state to come here and the jury may consider the bonus and the annual salary he missed to make an award of damages ) and Machado v. Harm,112 Cal.App. 748 [297 P.626, 629 {6}](1931) (testimony showing lost employment time is a  proper elements of damages).

8

26. A plaintiff seeking to prevail on a fraud claim must establish five elements: (1) that the defendant made a false representation of a material fact; (2) that the one making the representation knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff.  Bristol Bay Productions, LLC v. Lampack, 312 P. 3d 1155, 1160 ¶ 26 (Colo. 2013).

27. As for (1), Defendant DALE, through the shell of ROADRUNNER, made a false representation of a material fact by advertising that mere payment by a card for delivery to a residence address would be sufficient to sell the scooter and receive it, because he failed to include that he would also demand later private personal unnecessary information from the buyer to supply to a fraudulent entity not controlled by the defendant, and entity unlawfully doing business for the purpose of committing identity theft, and failed to represent that DALE himself was involved in that illegal scam of identity theft.

28. As for (2), DALE knew the material omitted was material because no one in their right mind would agree to give up personal private records as a condition to buying a scooter, so DALE deliberately failed to reveal that secret additional term that he planned to impose of buyers, and he had a record of executing that trick at least 1,000 times against unsuspecting buyers in the last

year alone.

29. As for (3) this plaintiff had no idea when he placed the order and paid that DALE was running a national scam with his fake company in New York City and would steal Mel's private records to sell for purposes of identify theft.

30.  As for (4) DALE, the owner and alter ego of ROADRUNNER, intended to fail to reveal that extra demand for identify records because he knew no one in their right mind would pay anything if they knew they would be blackmailed immediately. So DALE intended that Mel would rely on the false representations.

31. As for (5), Mel was harmed by the scam immediately, because DALE kept his money and his scooter, so it prevented Mel from spending Tuesday and Wednesday at the law library to respond by internet to a legal filing by Wednesday Jan. 5, and which was then dismissed Jan. 6, Thursday, for failure to adequately respond.

32. That was the point of getting the scooter, because of a physical disability that prevented other means of getting the work done on time. Getting the scooter was a "last ditch" effort to get to the library and spend the full two days of research necessary for a good response.

33.  Plaintiff's action against the college also had a value of over $2 million for violation of Section 504 of the Rehabilitation Act of 1973, and 29 United

States Code Section (§) 794, and its implementing regulation at 34 C.F.R. Part

104, which prohibits discrimination on the basis of disability.  So it was a good

claim.  And although that claim might still be available by a direct action in the

federal court, the time it takes to prosecute that action in the federal court to *force*

the college to grant the accommodation, is a two year event.  So again, these

defendants created a two year loss of life and *that* is a proper measure of damages

alone and is for a jury to determine, even without a likely job and career,

according to the decision of the Supreme Court of the United States in Heck v.

Humphrey, 512 U.S. 477, 114 S.Ct. 2364 [7], 129 L.Ed.2d 383 (1994)(damages

are available for lost years alone).

     34.  DALE cannot come now and say he did not know that loss would occur

or it was not foreseeable, because in Mel's internet letter to DALE on January 4 at

2:32 pm said this:

NOTICE OF POTENTIAL CLAIM FOR $2 MILLION TO $20 MILLION
* * *
If you have a legitimate reason for requiring my ID, rather than direct contact with
my banker, please say so now. If, so, please agree to accept by mail a copy of an
out-of-state license. . . . If it arrives too late to the work I need at the law libraries,
I will ask you to pay for the loss I describe above. It is your choice. Make it fast.
* * *
That means I will ask you to pay several million dollars for the loss of one (1)
law suit alone. Do not come later and say you are not liable because that loss was
not foreseeable.  I just made it foreseeable with this notice:
* * *
Please act quickly, and get this scooter to me tomorrow.  I can go directly to the
UPS hub in San Diego to get it if that is how you send it.

35. DALE could have simply called his LA storehouse that same day to have it delivered to UPS by January 5 and plaintiff would have had all day the 5th to get more legal research done than he had, although the failure to have it delivered on Tuesday the 4th may have destroyed his chances entirely.  So DALE knew continuing to hold it hostage would cause plaintiff significant financial harm, and intended to hurt as much as possible for failing to obey HIS HOLINESS holding Mel's scooter as hostage. DALE seems to believe that because his company is now rich and he has money and a popular commodity he can order buyers around whenever he feels like it, and they will obey and do whatever he says to get their scooters that he holds hostage until the innocent people comply.

36. Moreover, plaintiff had other actions that required submissions by January 10 and January 28 that plaintiff could not do and one day in the law library will not do it.  He missed those too. The claim for one is $3.8 million. The claim for the second is $4 million. And plaintiff had other duties that require fast action.

37.  Morever, the retaliatory conduct of DALE through his shell LLC demonstrated malice allowing a jury to award punitive damages. Because Mel was injured by DALE's retaliation by hostage taking, and Mel is in California, the California measure of punitive damages may be used by a jury regardless of whether the actual loss of Mel was $1,500 for the scooter or $3.8 million for the

12

dismissed or damaged legal claims.

38. In California juries may award up to 33% of the net worth of the company according to the Supreme Court of California in <u>Adams v. Murakami</u>, 54 Cal.3d 105,112 (1991). The net worth of the ROADRUNNER LLC on information and belief is $6 million.

39. WHEREFORE, plaintiff seeks and is entitled to damages against each defendant of $1,500 for the cost of the scooter, $300,000 for the opportunity cost for missed salary, plus $300,000 for the delay to start that career, plus $1 million for the loss of two years of time alone regardless of potential career and salary, plus $3.8 million for the cost of one lost legal action at this writing, and $2 million for punitive damages.

## SECOND CAUSE OF ACTION FOR CONVERSION

40. All prior allegations are incorporated into this one by this reference.

42. The elements of the tort of conversion are: that the defendants 1. knowingly exercised control over 2. anything of value 3. which was the property of Plaintiff, 4. without authorization, 5. with intent to permanently deprive Plaintiff of the use or benefit of the thing of value. <u>Itin v. Ungar,</u> 17 P. 3d 129, 131 n. 2 (Colo. 2000).

43. Element (1) is met here because the facts above show after DALE

13

received the message asking to accept an alternate method of proof to satisfy DALE, he retaliated by holding the scooter and informing Mel he will never hand it over.

44. Element (2) is met because the scooter has $1,500 value as well *usage* value for the legal research.

45. Element (3) is met because the scooter became Mel's the instant he paid for it. DALE's rationalization that he can keep it because he has not sold it yet, after accepting the money, is outside the law.

46. Element (4) is met because the correspondence clearly shows Mel did not authorize holding it, and that hostage-taking act was not a term of the contract of sale.

47. Element (5) is met because DALE plainly said in a message on about January 5 he will never send it to Mel.  That caused Mel to scramble for a taxi and a bus.

48. Once this jury finds that exercise of control was there, a plaintiff who is injured has a right to sue for the loss of the object no matter what its value. Orion Corporation v. State, 109 Wn.2d 621, 653-54 (Wash. 1997)(Federal takings jurisprudence is founded on the concept that a denial of all use resulting in a significant enough economic deprivation in and of itself amounts to a compensable taking).

49. And the value of the action depends not just on the value of the missing property, but on the loss is the *use* of it, how much is damaged the business of the person from whom it was taken. Mattingly, Inc. v. Beatrice Foods Co., 835 F. 2d 1547, 1569 (10th Cir. 1987).

50. Because it damaged Mel's legal actions resulting in dismissal and caused him to miss the class he needed for graduate admissions and work, he is correct to ask defendants to pay for that loss.

51.  WHEREFORE, plaintiff seeks and is entitled to damages against each defendant of $1,500 for the cost of the scooter, $300,000 for the opportunity cost for missed salary or for the delay to start that career, $1 million for the loss of two years of time alone regardless of potential career and salary, $3.8 million for the cost of one lost legal action at this writing, and $2 million for punitive damages.

## THIRD CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CIVIL CODE SECTION 1798.140(o)(1)

52.  All prior allegations are incorporated into this one by this reference.

53.  California Civil Code §1798.140(o)(1) makes it a violation of state law for a seller to collect private information from a consumer and then transfer that information to a third party that the seller did not name in the initial contract of seller and to which the buyer had no opportunity to refuse.

54. That includes full name, or address, or bank account number, or credit card number, or the name of the product purchased, or the email address of the buyer.

55. These are precisely what the ROADRUNNER seller sent to a third-party collecting that information did here, for the purpose of assisting that NY third-party to sell those records of this plaintiff for identity theft.

56. The same statute at § 1798.145 (e) provides for a private right of action, and California verdicts for breach of privacy have been awarded in recent years for $99,500 (Yip v. Tsang, KCO 61553 (Cal. Super. San Bern. May 7, 2014) and for $88,270 at Arnold v. Padrah, MSC 12-02895 (Cal. Super. Contra Costa Apr. 28, 2014).

57. A jury may award punitive damages if it also awards compensatory damages of any amount other than a token amount.

58. Plaintiff seeks and is entitled to compensatory damages for this invasion of his privacy of $99,000 as in Yip v. Tsang, because his privacy is not cheap.

59. In California juries may award up to 33% of the net worth of the company according to the Supreme Court of California in Adams v. Murakami, 54 Cal.3d 105,112 (1991). The net worth of the ROADRUNNER LLC on information and belief is $6 million.

60. Therefore, plaintiff seeks against each defendant 1/3 of that net worth of $6 million as punitive damages, or $2 million, and $1 million to compensate for the loss of that privacy under California Civil Code §1798.140(o)(1).

## FOURTH CAUSE OF ACTION
## FOR COMMON LAW INVASION OF PRIVACY

61. All prior allegations are incorporated into this one by this reference.

62. According to the High Court, a type of invasion of privacy occurs, separate from the statute of California described above, when a person's private information is exposed to others that he did not intend, even if it is true, as held in Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 489, 95 S.Ct. 1029, 1043, 43 L.Ed.2d 328 (1975)("the right [of one] to be free from unwanted publicity about his private affairs, which, although wholly true, would be offensive to a person of ordinary sensibilities"), and followed by Virgil v. Time, Inc., 527 F. 2d 1122, 1125 (9th Cir. 1975).

63. These defendants' actions to seize plaintiff's personal financial record and send it to a company doing business illegally that could use it for identify theft was offensive to a person of ordinary sensibilities, because everyone on this jury would find it offensive to seize their name, address, bank account information and other private information to send it to an illegal group in New York City collecting

17

those records for identify theft.

64. That seizure and exposure cost plaintiff two years of his life to engage this legal action to vindicate his right of privacy.

65. It also delayed his planned career two full years.

66. It also denied two years of salary. And because it was done intentionally by the defendants without prior approval by plaintiff, the defendants are guilty of invasion of privacy by exposing private facts about plaintiff.

67. That exposure was an actual and proximate cause of the loss of two years of plaintiff's life, career, and salary, as well as the loss of his right of privacy which is a different cost in and of itself from salary and time and career.

68. WHEREFORE, plaintiff seeks and is entitled to damages against each defendant of $1,500 for the cost of the scooter, $300,000 for the opportunity cost for missed salary, plus $300,000 for the delay to start that career, plus $1 million for the loss of he right of privacy itself regardless of potential career and salary, plus $3.8 million for the cost of one lost legal action at this writing, and $2 million for punitive damages.

69. These allegations are verified by the undersigned.

DATED: April 1, 2022

Mel  Marin

SAN DIEGO PSDU 92199
TUE 29 MAR 2022 PM

U S District Court
901 19th St. A105
Denver CO 80294

M Macin
Box 601133
S Diego CA 92160